# JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JENNIFER CARTER and CHRISTOPHER CLARKIN, on behalf of themselves and all others similarly situated,<br><br>             Plaintiffs,<br>   v.<br><br>VIVENDI TICKETING US LLC d/b/a SEE TICKETS,<br><br>            Defendant. | Case No.: SACV 22-01981-CJC (DFMx)<br><br>ORDER GRANTING IN SUBSTANTIAL PART PLAINTIFFS' MOTIONS FOR FINAL SETTLEMENT APPROVAL [Dkt. 48] AND FOR ATTORNEY FEES, EXPENSE REIMBURSEMENT, AND SERVICE AWARDS [Dkt. 38] AND OVERRULING OBJECTION [Dkt. 47] |

## I.   INTRODUCTION

In this putative class action, Plaintiffs Jennifer Carter and Christopher Clarkin assert claims against Defendant Vivendi Ticketing US LLC doing business as See Tickets arising out of a data breach that occurred between June 25, 2019 and January 8, 2022. (Dkt. 30 [First Amended Complaint, hereinafter "FAC"].)  Less than three months after the case was filed, the parties participated in a full-day private mediation and reached a

proposed settlement agreement (the "Settlement").  (Dkt. 31-3 [Settlement, hereinafter "SA"].)  After the Court granted preliminary approval of the Settlement, (Dkt. 43 [hereinafter "Prelim. Appr. Order"]), the settlement administrator, Angeion Group ("Angeion"), sent notice to the 437,310 class members.  (Dkt. 38-7 [Declaration of Sara Rugg, hereinafter "Rugg Decl."] ¶¶ 5–10.)  In response, Angeion received 6,864 claim forms and one request for exclusion.  (Dkt. 48-3 [Supplemental Declaration of Sara Rugg, hereinafter "Supp. Rugg Decl."] ¶ 7.)  One person filed an objection to the Settlement.  (Dkt. 47 [Objection, hereinafter "Obj."].)  Now before the Court are Plaintiffs' motions for final settlement approval (Dkt. 48, hereinafter "Mot.") and for attorney fees, expenses, and service awards (Dkt. 38, hereinafter "Fee Mot.").  For the following reasons, Plaintiffs' motions are **GRANTED IN SUBSTANTIAL PART** and the objection to the Settlement is **OVERRULED**.

## II.    BACKGROUND

### A.    Factual and Procedural Background

Defendant provides ticketing services for events including concerts, shows, festivals, and sporting events.  (FAC ¶¶ 2, 5.)  To buy tickets from Defendant, customers provide personal and financial information.  (*Id.* ¶¶ 5, 34.)  In April 2021, Defendant found out about activity indicating that hackers were able to access customer information from checkout pages on its website through a "skimmer."  (*Id.* ¶¶ 6, 35.)  "Skimmers are brief JavaScript codes injected into website checkout pages primarily to steal buyers' payment card details."  (*Id.*)  In January 2022, after nine months of investigation with a forensic firm, Defendant was able to stop the unauthorized access.  (*Id.* ¶¶ 7, 36.)  The data breach affected data customers provided purchasing tickets on Defendant's website between June 25, 2019, and January 8, 2022—a period of thirty months.  (*Id.* ¶ 7, 36.)  The information compromised includes customer names, addresses, zip codes, payment

card numbers, expiration dates, CVV numbers, and "potentially additional personally identifiable information." (*Id.* ¶ 10.) On October 24, 2022, Defendant filed a data breach notice with multiple states' attorneys general. (*Id.* ¶¶ 10, 38–40.) It also sent notice of data breach letters to approximately 437,310 individuals whose personal identifying information ("PII") was subject to unauthorized access. (Dkt. 31-2 [Barney Decl.] ¶ 12.)

On October 27, 2022, Plaintiffs filed this case, alleging that Defendant did not adequately safeguard class members' PII or provide timely and adequate notice of the breach. (*See* Dkt. 1 [Complaint]; FAC ¶¶ 14–16, 43–69.) For example, Plaintiffs allege Defendant failed "to encrypt payment card data at point-of-sale to make its customers' data more secure; failed to install updates, patches, and malware protection or to install them in a timely manner to protect against a data security breach; and/or failed to provide sufficient control employee credentials and access to computer systems to prevent a security breach and/or theft of payment card data." (FAC ¶ 77.) They allege they "have been exposed to a heightened and imminent risk of fraud and identity theft" due to the data breach, especially given the fact that they did not know their information had been compromised until more than three years after the unauthorized access began. (*Id.* ¶¶ 9–12, 17.) Based on these allegations, Plaintiffs assert claims for (1) negligence, (2) negligence *per se*, (3) breach of contract, (4) breach of implied contract, (5) violation of California's Unfair Competition Law, (6) violation of the California Consumer Privacy Act, (7) unjust enrichment, and (8) declaratory judgment. (*Id.* ¶¶ 113–204.)

## B.    Proposed Settlement Terms

On January 13, 2023, the parties participated in a full-day mediation session before Michelle Yoshida of Phillips ADR, a well-regarded private mediator, with the benefit of informal discovery and comprehensive mediation briefs. (Dkt. 48-2 [Barney Decl.] ¶ 8.) After vigorous negotiation during the mediation, the parties reached the Settlement. (*Id.*)

Under the Settlement, Defendant will create a $3 million settlement common fund to be used for four main purposes.  (SA § II.E.1.)  First, the common fund will be used to reimburse class members for documented (1) ordinary out-of-pocket expenses up to $1,000 per class member and (2) extraordinary expenses up to $5,000 per class member. (*Id.* § II.H.2.b.(i)-(ii).)  Second, it will provide a $100 "California Statutory Award benefit" to each member of the California sub-class.  (*Id.* § II.H.2.a.)  Third, it will provide class members either (1) 36 months of credit reporting or (2) a cash payment equal to a pro rata distribution of the remainder of the settlement fund once other payments are made, up to a total of $100 per person.  (*Id.* § II.H.2.b.iii.)  Fourth, it will be used to pay attorney fees and costs, a service award for Plaintiffs, and the settlement administrator's costs.  (*Id.* § II.E.1.)  Plaintiffs seek 25% of the $3 million settlement fund, or $750,000, as attorney fees and costs, $2,500 service awards for each of the two class representatives, and administrative costs were estimated to be $114,000.  (Fee Mot.; SA § II.G.)  If additional funds remain after these payments, a second *pro rata* cash distribution to claimants may be paid if such a payment would not be *de minimis*.  (SA § II.H.3.)  Any money remaining in the fund thereafter will be distributed as a *cy pres* award.  (*Id.* § II.H.4.)

In addition to the common fund, the Settlement provides two additional benefits for class members.  Each class member is eligible to receive a discount of $7.50 off a purchase on Defendant's website within 12 months.  (*Id.* § II.E.1.)  And Defendant will also implement the following security measures: (1) regular monitoring of code changes on checkout pages, (2) improved employee access controls and authentication requirements, including implementing strong password and rotation requirements and expanded multi-factor authentication for employees, (3) company-wide cybersecurity training, and (4) engagement of a Qualified Security Assessor.  (*Id.* § II.E.2.a.)

In exchange for the Settlement's benefits, participating class members agree to release claims "arising out of or relating to actual or alleged facts, transactions, events, matters, occurrences, acts, disclosures, statements, representations, omissions or failures to act relating to the" data breach.  (*Id.* § II.A.6.)

## C.     Notice and the Class's Response

After the Court granted preliminary approval of the Settlement, Defendant's counsel gave Angeion a list of the 437,310 class members.  (Rugg Decl. ¶ 5.)  Angeion successfully gave email notice to 431,635 of those class members (the rest "were not delivered due to hard bounces") on June 29, 2023.  (*Id.* ¶¶ 5–6.)  It then gave mail notice to the rest of the class members.  (*Id.* ¶¶ 7–8.)  375 of those notices were returned as undeliverable, so Angeion performed a skip trace and re-mailed notice to the 249 people for whom it could locate a new address.  (*Id.* ¶ 10.)  On September 20, 2023, Angeion sent a supplemental notice by email and mail.  (Supp. Rugg Decl. ¶¶ 3–4.)

Angeion also created a settlement website and a toll-free telephone number. (Supp. Rugg Decl. ¶¶ 5–6.)  As of October 12, 2023, the website had been accessed more than 48,461 times and the hotline had received 300 calls for a total of 988 minutes.  (*Id.*)

The deadlines for class members to exclude themselves from the Settlement, object to it, and submit claims under it have passed.  (*See* Rugg Decl. ¶ 13; Supp. Rugg Decl. ¶¶ 7, 11–12.)  Angeion received 6,864 claims[1], 6,859 on the online portal and five by mail.  (Supp. Rugg Decl. ¶¶ 7, 11–12.)  Of those claims, 262 requested reimbursement of ordinary out-of-pocket expenses totaling $123,452.62, and 64 requested reimbursement of extraordinary out-of-pocket expenses totaling $157,030.18.  (*Id.* ¶ 8.)  468 people

---

[1] This number includes thirteen claims filed one day after the claims deadline, which Angeion accepted with both parties' consent.  (Dkt. 50-1 [Barney Decl.] ¶ 7.)

requested credit monitoring services, while 6,391 requested the alternative cash payment. (*Id.*)  And 1,281 class members eligible for the California statutory benefit filed a claim. (*Id.*)  One person requested exclusion, and one other person filed an objection.  (*See id.* Ex. C [Exclusion and Objection List]; Dkt. 47 [Objection, hereinafter "Obj."].)

Based on the claims numbers and requested reimbursement amounts, Angeion estimates class members who chose to receive the alternative cash payment amount rather than credit monitoring services will receive the maximum $100 amount and that all class members will likely receive a second *pro rata* payment of more than $140.  (*Id.* ¶ 9.)

## III.   DISCUSSION

In deciding whether to grant the motions for final approval and attorney fees, the Court analyzes (1) whether to certify a class for settlement purposes and (2) the fairness of the Settlement.

### A.    Class Certification

A plaintiff seeking class certification must satisfy two sets of requirements under Federal Rule of Civil Procedure 23: (1) Rule 23(a)'s requirements of numerosity, commonality, typicality, and adequacy, and (2) Rule 23(b)'s requirement that the action fall within one of the three "types" of classes described in its subsections.  Here, Plaintiffs seek certification under Rule 23(b)(3), which allows certification if a court "finds the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Fed. R. Civ. P. 23(b)(3).  The Court previously concluded that Plaintiffs presented sufficient evidence to show that the proposed class satisfies these requirements.  (*See* Prelim. Appr. Order at

5–11.)  Having reviewed those requirements again, the Court adopts its prior analysis regarding class certification and grants certification of the proposed class for settlement purposes only.  *See Atzin v. Anthem, Inc.*, 2022 WL 4238053, at *3 (C.D. Cal. Sept. 14, 2022) ("Nothing has changed to disturb [the court's prior] conclusion, and class certification remains appropriate.").

## B.    Fairness of the Proposed Settlement

Although there is a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned," *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998), a settlement of class claims requires court approval. Fed. R. Civ. P. 23(e).  This is because "[i]ncentives inhere in class-action settlement negotiations that can, unless checked through careful district court review of the resulting settlement, result in a decree in which the rights of class members, including the named plaintiffs, may not be given due regard by the negotiating parties."  *Staton v. Boeing Co.*, 327 F.3d 938, 959 (9th Cir. 2003) (cleaned up).

Rule 23(e) governs approval of class action settlements.  Courts may approve such settlements only when they are "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2). In evaluating a settlement, courts must consider whether (1) the class representatives and class counsel have adequately represented the class, (2) the proposal was negotiated at arm's length, (3) the relief provided for the class is adequate, and (4) the proposal treats class members equitably relative to each other.  Fed. R. Civ. P. 23(e)(2)(A–D).

### 1.    Plaintiffs' and Class Counsel's Adequacy

Plaintiffs and class counsel have adequately represented the class.  There is no evidence of a conflict of interest between Plaintiffs and the class.  Their claims regarding

this data breach are identical to those of other class members, and they have every incentive to vigorously pursue those claims.  Plaintiffs' counsel is likewise adequate. Mason A. Barney and his law firm Siri & Glimstad LLP have extensive experience litigating data breach class actions and have ably litigated this case to date, efficiently securing a significant settlement.  (*See* Dkt. 48-2 [Barney Decl.] ¶ 3; Dkt. 31-6 [Firm Resume].)

## 2.  Arm's Length Negotiations

The Settlement, which is the product of a full day of vigorous negotiations between counsel before a neutral mediator, appears to be the result of arms-length negotiations between the parties.  *See Hashemi v. Bosley, Inc*., 2022 WL 2155117, at *6 (C.D. Cal. Feb. 22, 2022) ("The parties extensively negotiated the Settlement over several months prior to mediation and ultimately reached a final agreement only after arms-length negotiations before mediator Mr. Picker.").  Although the "mere presence of a neutral mediator . . . is not on its own dispositive" to show a lack of collusion, it is "a factor weighing in favor of a finding of non-collusiveness."  *See In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 948 (9th Cir. 2011); *Hashemi*, 2022 WL 2155117, at *6; *Thompson v. Transamerica Life Ins. Co.*, 2020 WL 6145105, at *3 (C.D. Cal. Sept. 16, 2020) ("The Settlement is the product of extensive negotiations between the Parties with the assistance, and direct supervision, of an experienced and highly-regarded nationally-renowned mediator . . . who conducted a full-day, in-person mediation with all Parties as well as a follow-up mediation telephone conference with all Parties.").  And as discussed in more detail in Section III.B.3.c., the Settlement does not have any "'subtle signs' of collusion."  *See Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Briseno v. ConAgra Foods, Inc.*, 998 F.3d 1014, 1022 (9th Cir. 2021).  The Court is satisfied that the parties negotiated the Settlement at arm's length.

### 3. Adequacy of Class Relief

In determining whether the class's relief is "adequate," courts consider "(i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3)." *Id.* 23(e)(2)(C).[2] The Court finds the relief reflected in the Settlement to be adequate.

### a. Costs, Risks, and Delay of Trial and Appeal

The Settlement reflects a substantial outcome for the individuals Defendant's data breach affected. Class members will receive compensation for documented ordinary and extraordinary losses. (*See* Supp. Rugg Decl. ¶ 8.) They will also receive either three years of credit monitoring and identity theft insurance services or a cash payment of $100, whichever they requested in their claim form. (*Id.* ¶¶ 8–9.) In addition, they will also each receive a second *pro rata* payment of about $140. (*Id.* ¶ 9.) Further, they will receive a $7.50 discount on Defendant's website in the next year. Finally, members of the California sub-class will also receive a $100 statutory award.[3] This is an extremely

---

[2] Before Congress codified these factors in 2018, courts applied the following factors in determining whether a settlement was fair, reasonable, and adequate: "[1] the strength of plaintiffs' case; [2] the risk, expense, complexity, and likely duration of further litigation; [3] the risk of maintaining class action status throughout the trial; [4] the amount offered in settlement; [5] the extent of discovery completed, and the stage of the proceedings; [6] the experience and views of counsel; [7] the presence of a governmental participant; and [8] the reaction of the class members to the proposed settlement." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048 (9th Cir. 2019); *Staton*, 327 F.3d at 959. The Court still considers these factors to the extent they shed light on the Rule 23(e) inquiry.

[3] In evaluating the fairness and adequacy of the Settlement, the Court does not attribute value to changes in Defendant's security practices. The value of those changes is questionable in light of a subsequent data breach that appears to have occurred on Defendant's network between February 28, 2023 and July 2, 2023. *See Peterson v. Vivendi Ticketing US LLC, d/b/a See Tickets, Inc.*, Case No. 2:23-cv-07498, *Fitzgerald v. Vivendi Ticketing US LLC, d/b/a See Tickets, Inc.*, Case No. 2:23-cv-07887, *Richmond v.*

significant outcome for the class.  Indeed, other courts have approved settlements in privacy and security cases when each class member received just a few dollars or less. (*See* Fee Mot. at 18–19 [collecting cases approving settlement funds with individual class member recovery ranging from $0.75 to 5.24]; Mot. at 26–27 [similar with recovery ranging from $1.41 to $6.19]); *see, e.g.*, *In re Yahoo!*, 2020 WL 4212811, at *10 (approving a Settlement Fund of $117.5 million with a settlement class size of approximately 194 million and collecting cases where recovery was only a few dollars per person or less); *Hashemi*, 2022 WL 2155117, at *7 (collecting cases with estimated settlement values of less than $1 per class member).  Some privacy class actions have even settled for non-monetary relief alone.  *See, e.g.*, *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *8 (N.D. Cal. Aug. 18, 2017) (granting final approval of settlement providing for declaratory and injunctive relief in litigation alleging Facebook engaged in user privacy violations), *aff'd,* 951 F.3d 1106 (9th Cir. 2020); *In re Google LLC St. View Elec. Commc'ns Litig.*, 2020 WL 1288377, at *16 (N.D. Cal. Mar. 18, 2020) (granting final approval of settlement providing injunctive relief and creating a non-distributable *cy pres* settlement fund in litigation alleging Google violated privacy by illegally gathering Wi-Fi network data).

The benefits class members will receive under the Settlement present a fair compromise given the costs, risks, and delay of trial and appeal.  Although litigation had not progressed far, the parties had the benefit of informal discovery, including Defendant providing the number of impacted class members and a breakdown of those members by state. (Dkt. 31-2 [Barney Decl.] ¶ 4.)  Class counsel also gathered all publicly available information regarding the data breach. (Dkt. 31 at 18.)  And the parties attended a full-day mediation session after preparing comprehensive mediation briefs.  (*Id.* at 2.)

---

*Vivendi Ticketing US LLC, d/b/a See Tickets*, Case No. 2:23-cv-07967, *Loughead v. Vivendi Ticketing US LLC, d/b/a See Tickets*, Case No. 2:23-cv-08134, and *Verderame v. Vivendi Ticketing US LLC, d/b/a See Tickets*, Case No. 2:23-cv-08446.

With all that information, the parties were able to realistically value the scope of Defendant's potential liability and assess the costs, risks, and delay of continuing to litigate. *See In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) (explaining that settlement approval is favored when the "parties have sufficient information to make an informed decision about settlement" (cleaned up)). Those costs and risks are not insignificant. Because this case involving 437,310 people has not yet progressed far, substantial litigation costs would be required to take the case to trial. (*See* Mot. at 22–23.) Substantial discovery, including document discovery and depositions, would be required. Extensive and expensive expert analysis would be needed. In addition to costs, there are also significant risks associated with class certification, summary judgment, and trial. *In re Portal Software, Inc. Sec. Litig.*, 2007 WL 4171201, at *3 (N.D. Cal. 2007) ("Additional consideration of increased expenses of fact and expert discovery and the inherent risks of proceeding to summary judgment, trial and appeal also support the settlement."); *In re Netflix Privacy Litig.*, 2013 WL 1120801, at *6 (N.D. Cal. Mar. 18, 2013) ("The notion that a district court could decertify a class at any time is one that weighs in favor of settlement." (citation omitted)); *Hashemi v. Bosley, Inc. ("Hashemi II")*, 2022 WL 18278431, at *4 (C.D. Cal. Nov. 21, 2022) ("[C]oming up with a feasible trial plan would be difficult given that no data breach case for damages has ever proceeded to trial."). Even if Plaintiffs could secure a better result than the Settlement represents at trial, any result obtained then would take significantly longer and there is a risk that Plaintiffs could have received much less, or nothing at all. *See In re Omnivision Techs., Inc.*, 559 F. Supp. 2d 1036, 1041–42 (N.D. Cal. 2008) (discussing how a class action settlement offered an "immediate and certain award" in light of significant obstacles posed through continued litigation).

These general risks are heightened in data breach cases like this one. (*See* Mot. at 23 ["[T]his is an especially complex case in an especially risky practice area."] [collecting cases]); *see, e.g.*, *Gaston v. FabFitFun, Inc.*, 2021 WL 6496734, at *3 (C.D.

Cal. Dec. 9, 2021) ("Historically, data breach cases have experienced minimal success in moving for class certification."); *Hashemi*, 2022 WL 2155117, at \*7 (explaining that "data breach class actions are a relatively new type of litigation and that damages methodologies in data breach cases are largely untested and have yet to be presented to a jury"). For example, tying Plaintiffs' alleged injuries to this particular data breach may be difficult. (*See* Dkt. 38-2 [Barney Decl.] ¶ 8 ["See Tickets initially rejected each and every one of Plaintiffs' claims, including asserting that Plaintiffs lacked any damages."]); *Hashemi II*, 2022 WL 18278431, at \*4 (noting "causation-related standing issues common in data breach litigation"). Moreover, class members' injuries may have been minimal given that, according to Defendant, the data breach did not involve their Social Security numbers, state identification numbers, or bank account information. (Dkt. 38-6.) Indeed, Plaintiffs made "no allegations of actual misuse," and "there was a risk that a court could have found insufficient damages for Article III purposes." (Fee Mot. at 20 [citing cases when courts found plaintiffs lacked standing in cases similar to this one].)

The Settlement removes these costs and risks "by ensuring class members a recovery that is certain and immediate, eliminating the risk that class members would be left without any recovery at all." *Graves v. United Indus. Corp.*, 2020 WL 953210, at \*7 (C.D. Cal. Feb. 24, 2020) (cleaned up); *see In re Cobra Sexual Energy Sales Pracs. Litig.*, 2021 WL 4535790, at \*6 (C.D. Cal. Apr. 7, 2021). "It also secures a settlement now rather than imposing the delay of additional litigation, which in this case could span years." *Farrar v. Workhorse Grp., Inc.*, 2023 WL 5505981, at \*7 (C.D. Cal. July 24, 2023). This factor strongly suggests the Settlement's adequacy.

### b.    Effectiveness of Proposed Method of Distributing Relief

Next, the Court must consider "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims."

Fed. R. Civ. P. 23(e)(2)(C).  "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.  "A claims processing method should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding."  *Id.*

Here, the relief distribution is straightforward.  Class members were able to easily complete and submit either by mail or online a simple claim form for ordinary and extraordinary cost reimbursement, credit monitoring services, and/or a subclass payment.  (*See* SA§ II.J.3, Ex. C; Rugg Decl. Ex. E [Claim Form].)  And they were able to select payment by PayPal, Venmo, Zelle, Virtual Prepaid Card, or physical check.  (Rugg Decl. Ex. E at 4.)  The procedure for filing claims was not unduly demanding and the proposed method of relief distribution also appears adequate.

### c.      Award of Attorney Fees and Costs

Next, in analyzing the adequacy of relief the Court must consider "the terms of any proposed award of attorneys' fees, including timing of payment."  Fed. R. Civ. P. 23(e)(2)(c).  When reviewing attorney fee requests in class action settlements, courts have discretion to apply the percentage-of-the-fund method or the lodestar method to determine reasonable attorney fees.  *See Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000); *Bluetooth*, 654 F.3d at 944–45.  Here, counsel seeks a fee award of 25% of the $3 million settlement fund, or $750,000.  (Fee Mot. at 10.)  In calculating the requested award, counsel does not include in the value of the Settlement the $7.50 website discount class members will receive or any value of Defendants' security practice changes.

In considering proposed attorney fee awards, courts must scrutinize settlements for three factors that tend to show collusion: (1) when counsel receives a disproportionate

distribution of the settlement, (2) when the parties negotiate a "clear sailing arrangement," under which the defendant agrees not to challenge a request for agreed-upon attorney fees, and (3) when the agreement contains a "kicker" or "reverter" clause that returns unawarded fees to the defendant, rather than the class. *Briseno*, 998 F.3d at 1022. The Settlement contains no clear sailing arrangement and no kicker or reverter clause. *See id.* The fee counsel seeks is also not "disproportionate." *See Bluetooth*, 654 F.3d at 947. The Ninth Circuit has held that 25% of a settlement fund is the "benchmark" for a reasonable fee award. *Id.* at 942–43. In deciding whether "'special circumstances' justify[ ] a departure" upward or downward from the benchmark, *id.* at 942, courts typically consider (1) the size of the fund, (2) the quality of the results achieved, (3) the risk counsel undertook, (4) the skill required and the quality of work, (5) the contingent nature of the fee and the financial burden carried by the plaintiff, and (6) awards made in similar cases. *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1048–50 (9th Cir. 2002).

Counsel's requested award of fees and costs is appropriate. "The overall result and benefit to the class from the litigation is the most critical factor in granting a fee award," and class members are receiving a very significant benefit from this litigation as a result of counsel's effort. *In re Omnivision Techs.*, 559 F. Supp. 2d at 1046. Indeed, many class members are eligible to receive hundreds of dollars in cash, even if they have no expenses to be reimbursed. The risk of litigation was real and substantial—especially when the breach did not involve Social Security numbers or bank account information—and the fee was also contingent. (Dkt. 38-2 [Barney Decl.] ¶ 11.) It is also relevant that counsel successfully negotiated the Settlement with a company represented by a prominent litigation firm. *See Gutierrez v. Amplify Energy Corp.*, 2023 WL 3071198, at *5 (C.D. Cal. Apr. 24, 2023) (citing *In re Am. Apparel, Inc. S'holder Litig.*, 2014 WL 10212865, at *22 (C.D. Cal. July 28, 2014) ("In addition to the difficulty of the legal and factual issues raised, the court should also consider the quality of opposing counsel as a measure of the skill required to litigate the case successfully.")). "There [are] no special

circumstances here indicating that the 25% benchmark award [is] either too small or too large." *See In re MGM Mirage Sec. Litig.*, 708 F. App'x 894, 897–98 (9th Cir. 2017). And awards in other cases confirm that the benchmark is appropriate. *See, e.g., Pfeiffer v. RadNet, Inc.*, 2022 WL 2189533, at *2 (C.D. Cal. Feb. 15, 2022) (finding benchmark award appropriate when class counsel reached a total settlement of $2,600,000 and requested 25% of the settlement fund, or $650,000, finding that "the settlement recovery is comparable to that of other data breach settlements"); (Fee Mot. at 22 [collecting cases]).

A lodestar cross-check also confirms the reasonableness of the benchmark award. Courts commonly perform a lodestar cross-check to assess the reasonableness of the percentage award. *See In re Apple Inc. Device Performance Litig.*, 50 F.4th 769, 784 (9th Cir. 2022) ("A cross-check is discretionary, but we encourage one when utilizing the percentage-of-recovery method."); *Vizcaino*, 290 F.3d at 1050 ("Calculation of the lodestar, which measures the lawyer's investment of time in the litigation, provides a check on the reasonableness of the percentage award."); *Bluetooth*, 654 F.3d at 943 (encouraging a "comparison between the lodestar amount and a reasonable percentage award"); *see also Chambers v. Whirlpool Corp.*, 980 F.3d 645, 663 (9th Cir. 2020) (confirming that a lodestar cross-check is "ordinarily" not required). Class counsel submitted evidence of a $325,452.50 lodestar fee based on 537.4 hours spent at hourly rates between $225 and $825. (Dkt. 38-2 [Barney Decl.] ¶ 12, Exs. B–C; Dkt. 50-1 [Barney Decl.] ¶ 5, Exs. A–B.) They seek a 2.3 multiplier on the lodestar based on the quality of their representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented. (Fee Mot. at 24; Dkt. 50 at 9); *see Vizcaino*, 290 F.3d at 1051. "[C]ourts have routinely enhanced the lodestar to reflect the risk of non-payment in common fund cases," and "multiples ranging from one to four are frequently awarded in common fund cases when the lodestar method is applied." *Id.* at 1051, n.6. Indeed, some courts have described multipliers ranging from one to four as

"presumptively acceptable." *Gutierrez*, 2023 WL 3071198, at *6 (citing *Dyer v. Wells Fargo Bank, N.A.*, 303 F.R.D. 326, 334 (N.D. Cal. 2014)).

The Court has reviewed the information provided and concludes that the lodestar amount with the requested multiplier fairly compensates the attorneys in this case given the excellent result they achieved for the class, the able representation of counsel, the investigation, discovery, negotiation, and other work performed, and the substantial risk counsel undertook in this data breach class action. *See Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016) ("Counsel's lodestar yields a 3.07 multiplier, which is well within the range for reasonable multipliers.") (collecting cases); (Fee Mot. at 25 [collecting cases with multipliers up to 3.65]); *see also In re Coordinated Pretrial Proc. in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 607 (9th Cir. 1997) (explaining that comparing the lodestar fee to the 25% benchmark "resembles what lawyers commonly do when they draft a bill based on hours spent, consider the bottom line as compared with the value of the result, then cut the bill if the total seems excessive as compared with the results obtained"); *Pfeiffer*, 2022 WL 2189533, at *3 ("Historically, data breach cases have had great difficulty in moving past the pleadings stage and receiving class certification. . . . Because Class Counsel took this case on a contingency basis in a risky and still-developing area of law, this factor weighs in favor of the proposed attorneys' fee award."). Counsel's lodestar therefore confirms the reasonableness of the fees sought.

The Court has also reviewed counsel's request for $9,122.85 in litigation costs incurred for pro hac vice admission fees, process server fees, computer research fees, mediation fees, postage and mailing, and courtesy copies, and the supporting documentation. (Dkt. 38-2 [Barney Decl.] ¶¶ 17–18.) These are generally the types of expenses that are reasonably and necessarily incurred in litigation and routinely charged to paying clients in non-contingency cases. *See Bato v. Lab'y Corp. of Am. Holdings*,

2011 WL 13412376, at *17 (C.D. Cal. Mar. 14, 2011) (explaining that discovery costs "paved the way for settlement," and computerized legal research "was necessary to examine the legal basis for plaintiffs' claims" and to oppose a motion to dismiss"). The only exception is that the necessity of an April 14, 2023 expense of $21.75 for obtaining a $20 money order is unexplained. The Court therefore finds $9,101.10 in costs to be reasonable and supported by the documentation submitted.

The Court will make one change in calculating class counsel's fee: it will apply the benchmark percentage after deducting litigation and administration costs from the common fund. In other words, to calculate attorney fees in this case, the Court will apply the benchmark to the amount the class recovers. Calculating the percentage fee before deducting expenses would mean that counsel not only gets reimbursed for his costs but also receives an additional 25% of those costs as a fee. *See, e.g.*, *Smith v. Experian Info. Sols., Inc.*, 2020 WL 6689209, at *7 (C.D. Cal. Nov. 9, 2020) (calculating benchmark fees by deducting litigation costs and settlement administrator costs from the settlement amount, and taking 25% of that amount); *In re Apple iPhone/iPad Warranty Litig.*, 40 F. Supp. 3d 1176, 1182 (N.D. Cal. 2014) (same); *Kmiec v. Powerwave Techs., Inc.*, 2016 WL 5938709, at *5 (C.D. Cal. July 11, 2016) (same); *Kanawi v. Bechtel Corp.*, 2011 WL 782244, at *3 (N.D. Cal. Mar. 1, 2011) (same). And deducting the settlement administrator's expenses before calculating the fee ensures that class counsel's incentive remains keeping those costs low. *Farrar*, 2023 WL 5505981, at *10. Subtracting $114,000 for Angeion's settlement administration costs (SA § II.G.) and $9,101.10 in litigation costs from the $3 million Settlement amount yields $2,876,898.90. Applying the 25% benchmark rate to that sum yields $719,224.73. Accordingly, the Court will award class counsel $719,224.73 in attorney fees.

In addition to the amount of counsel's fees and costs, the Court must scrutinize the timing of payment. Fed. R. Civ. P. 23(e)(2)(c). The Settlement provides that any fees

awarded to class counsel must be paid within thirty days of the Effective Date, which is "the later of either the expiration of the time for filing an appeal of the Final Approval Order, or if a timely appeal is made, the date of the final resolution of that appeal and any subsequent appeals resulting in final approval of the Settlement Agreement without any material modification or condition." (*See* SA § II.D.; II.F.1.) That date is before class members can expect to be compensated. (*See id* § II.H.5. [providing that "[c]laims of Settlement Class members that are deemed valid will result in Initial Distributions being made to Settlement Class members within ninety (90) days from the Effective Date, or as soon thereafter as is reasonably practical"].) In theory, this could cast a slight shadow on the proposed fee and cost arrangements. *See, e.g.*, *Salas Razo v. AT&T Mobility Servs., LLC*, 2022 WL 4586229, at *13 (E.D. Cal. Sept. 29, 2022) ("[C]ounsel will receive payment at the same time as Class Members, and the timing of payment does not weigh against preliminary approval of the Class Settlement."). But counsel's explanation of the reason for the disparity shows that it does not reflect any collusion or other nefarious intent; rather, it simply takes time for the Settlement Administrator to review the documentation class members submit of their losses to ensure that they qualify for the type of payment requested. (Fee Mot. at 29–30.) Especially given the strong showing of arm's length negotiation and lack of collusion in this case, the relatively small gap between payments standing alone is not so significant as to weigh against granting final approval of the Settlement. *See Brightk Consulting*, 2023 WL 2347446, at *9; (Fee Mot. at 30 [collecting cases reflecting similar time differentials]).

### d.    Any Agreement Made in Connection with the Proposal

The Court must also consider whether there is "any agreement required to be identified under Rule 23(e)(3)," Fed. R. Civ. P. 23(e)(2)(C)(iv)—that is, "any agreement made in connection," *id.* 23(e)(3). The parties have identified no agreement other than the Settlement.

### e.  Class Members' Reaction to the Settlement

Finally, in assessing the adequacy of the Settlement the Court considers class members' reaction to it.  As explained, after sending notice to the 437,310 class members, Angeion received 6,864 claims and only one request for exclusion.  (Supp. Rugg Decl. ¶¶ 7, 11–12, Ex. C.)  One person filed an objection.  These numbers indicate strong overall support for the Settlement and weigh in favor of granting final approval.

To begin, the 1.6% claims rate is in line with claims rates in other data breach class action settlements that courts have approved.  (*See* Mot. at 17 [collecting cases]); *In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 321 (N.D. Cal. 2018) (granting final approval with 1.8% claims rate); *Schneider v. Chipotle Mexican Grill, Inc.*, 336 F.R.D. 588, 599 (N.D. Cal. 2020) (granting final approval with 0.83% claims rate, stating that the rate was "on par with other consumer cases, and d[id] not otherwise weigh against approval") (citing *Broomfield v. Craft Brew Alliance, Inc.*, 2020 WL 1972505, at *7 (N.D. Cal. Feb. 5, 2020) (approving settlement with response rate of "about two percent"); *Bostick v. Herbalife Int'l of Am., Inc.*, 2015 WL 12731932, at *27 (C.D. Cal. May 14, 2015) (approving settlement with "response rate of less than 1%")); *see Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1306 (9th Cir. 1990) ("Settlements of large class action suits have been approved even where less than five percent of the class files claims."); *see also Cottle v. Plaid Inc.*, 340 F.R.D. 356, 374 (N.D. Cal. 2021) (treating favorably a settlement administrator's estimate that a claims rate would be "between 1% and 4% of the proposed class of 98 million individuals").

The fact that there was only one request for exclusion and one objection also indicates strong support for the Settlement and weighs in favor of granting final approval. *See, e.g.*, *Kacsuta v. Lenovo (United States) Inc.*, 2014 WL 12585787, at *5 (C.D. Cal. Dec. 16, 2014) ("Because the reaction of the class to settlement has been almost entirely

positive, with only two objections, this factor favors final approval."); *Hashemi II*, 2022 WL 18278431, at *6 ("Very few objections and opt-outs create a strong presumption that the Settlement is beneficial to the Class and thus warrants final approval."); *In re Lifelock, Inc. Mktg. & Sales Practices Litig.*, 2010 WL 3715138, at *6 (D. Ariz. Aug. 31, 2010) (explaining that low number of timely written objections and requests for exclusion supported settlement approval); *National Rural Telecomms. Cooperative v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004) ("It is established that the absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class settlement action are favorable to the class members.").

Moreover, the objection submitted does not pose a barrier to final approval.[4] The objector, Susan Lau, raises five concerns, none of which identifies any reason why the proposed Settlement would be unfair, unreasonable, or inadequate. *See Browne v. Am. Honda Motor Co.*, 2010 WL 9499072, at *15 (C.D. Cal. July 29, 2010) ("When considering class members' objections, however, the district court must evaluate whether they identify reasons why the proposed settlement may be unfair."). First, she objects to class counsel's fees because "[t]his case is not setting a precedence and the attorneys have listed other cases to copy and to provide evidence of harm to class action parties in other data breach cases." (Obj. at 1.) This objection does not take into account the significant result achieved, the significant benefit class members are receiving as a result of counsel's effort, and the costs, risks, and delay of trial and appeal in data breach litigation. As explained, the requested 25% benchmark award—calculated by taking 25% of the common fund, not the full value of the settlement—appropriately compensates class counsel in light of these factors.

---

[4] Plaintiffs argue that Ms. Lau's objection relating to counsel's fees was timely but her objections to the terms of the Settlement was untimely. (Dkt. 51 at 10, 14.) The Court will consider Ms. Lau's objection regardless of its timeliness.

Second, Ms. Lau objects to the claim deadline, stating that the email she received about the Settlement on September 20, 2023 went to her junk email folder and caused her to miss the September 27, 2023 claim deadline.  (Obj. at 2.)  But the September 20, 2023 email Ms. Lau received was a supplemental notice.  (Supp. Rugg Decl. ¶¶ 3–4.)  The original notice went out on June 29, 2023, giving ample time to file a claim.  (Rugg Decl. ¶ 6.)  The fact that the supplemental notice went out a week before the deadline to file a claim does not undermine the fairness of the Settlement.  Indeed, counsel represents that the administrator accepted the only late claims made.  (Dkt. 50 at 14.)  The fact that the supplemental notice went to Ms. Lau's junk email folder also does not raise concerns sufficient to deny final approval.  *See, e.g.*, *In re Apple iPhone/iPod Warranty Litig.*, 2014 WL 12640497, at *9 (N.D. Cal. May 8, 2014) (overruling objection that one of two email notices of the proposed settlement ended up in the objector's spam folder, explaining that "[c]ourts routinely approve email notice campaigns and, inevitably, some email messages will end up in a spam folder—just as some postal mail will never reach its intended recipient").

Third, Ms. Lau objects that she has "no use" for the $7.50 credit on Defendant's website because "no trust has been re-established" regarding Defendant's security practices, and "[t]he award should be a full credit towards any future concert or festival ticket."  (Obj. at 2.)  But even if class members choose for any reason not to use the offered credit on Defendant's website, the Settlement provides them significant relief.  A California class member like Ms. Lau is eligible to receive credit monitoring or $100, a $100 California subclass payment, and a $140 *pro rata* distribution, *plus* any qualifying reimbursement.  (Mot. at 25.)  Contrary to Ms. Lau's contention, that relief is adequate even when class members receive a website credit of $7.50 rather than the full value of a concert or festival ticket.  *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir. 1998) ("Settlement is the offspring of compromise; the question we address is not

whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.").

Fourth, Ms. Lau objects to the credit monitoring portion of the Settlement because she has already paid for credit monitoring and wants the credit monitoring under the Settlement "to start when [her] current credit monitoring has stopped," i.e. "when [she] actually needs it." (Obj. at 2.) But "[t]his is exactly why the Settlement Agreement provides a cash alternative for when people already have, or do not want, credit monitoring. The cash can be used, for example, to extend an existing credit monitoring plan." *In re Anthem*, 327 F.R.D. at 321 (citation omitted). Moreover, if Ms. Lau purchased the credit monitoring she currently has in response to this data breach, the Settlement also entitled her to reimbursement for that expense. (Dkt. 50 at 15–16 [citing SA § II.H.2.b.i.a.].) Ms. Lau's objection that "[t]he settlement for credit monitoring or equivalent service should be available for class member's respective lifetimes" (Obj. at 2) is also unpersuasive, especially since the most sensitive information involved in the breach, credit and debit card information, can be changed. The three years of credit monitoring or $100 alternative cash payment, together with the other Settlement benefits, represents an acceptable compromise between the strength of Plaintiffs' claims and the costs, risks, and delay of trial. *See In re Anthem*, 327 F.R.D. at 321 (rejecting objections that "only lifetime credit monitoring would be enough" and that "class members need a lifetime of identity theft insurance").

Fifth, Ms. Lau objects that "the payment for to the class action suit should be granted without the burden of proof of identity theft. It does not make sense to actually become a victim of identity theft in the future and then try to submit a claim when the deadline has passed." (Obj. at 2.) But the Settlement does not require a person to be a victim of identity theft to recover under it. The only relief a class member must show identity theft to obtain is compensation for extraordinary documented losses. (Dkt. 50 at

16–17.)  Accordingly, a California class member like Ms. Lau who cannot show actual identity theft is eligible to receive reimbursement of ordinary losses up to a total of $1,000, credit monitoring or a cash payment of $100, a $100 California subclass payment, and a $140 *pro rata* distribution.  (Mot. at 25.)

In sum, after examining the Rule 23(e)(2) factors, the Court concludes that the Settlement is "fair, reasonable, and adequate."

## 4.  Equitable Treatment Among Class Members

The final Rule 23(e) factor turns on whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2).  "Matters of concern could include whether the apportionment of relief among class members takes appropriate account of differences among their claims, and whether the scope of the release may affect class members in different ways that bear on the apportionment of relief."  Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment.

Class members may receive differing payouts under the Settlement depending on what documentation they have of their ordinary and extraordinary costs resulting from the data breach.  This difference in treatment is appropriate and reasonable.  The Settlement also treats California sub-class members differently than class members from other states based on their claims that provide for statutory damages.  This distinction is also reasonable.  The release is also the same for all class members.  The Court finds that the Settlement treats class members equitably.

//
//
//

### 5. Incentive Awards

Plaintiffs also seek service awards of $2,500 each for the two class representatives. (Fee Mot. at 30.)  Incentive or service awards are payments to class representatives for their service to the class in bringing the lawsuit.  *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1163 (9th Cir. 2013).  Such awards "encourage individuals to undertake the responsibilities and risks of representing the class and recognize the time and effort spent in the case."  *In re Anthem*, 2018 WL 3960068, at *30.  They "are fairly typical in class action cases" and are discretionary.  *Rodriguez v. W. Pub. Corp.*, 563 F.3d 948, 958 (9th Cir. 2009); *Vasquez v. Coast Valley Roofing, Inc.*, 266 F.R.D. 482, 499 (E.D. Cal. 2010).  In the Ninth Circuit, a $5,000 incentive award is "presumptively reasonable." *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015); *see Harris v. Vector Marketing Corp.*, 2012 WL 381202, at *7 (N.D. Cal. Feb. 6, 2012) (collecting cases); *see also In re Apple Inc. Device Performance Litig.*, 50 F.4th at 787 (confirming that "[s]o long as [incentive awards] are reasonable, they can be awarded").  When evaluating the reasonableness of incentive awards, courts consider "the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions," and the time the plaintiff spent pursing the litigation. *Staton*, 327 F.3d at 977.

The proposed incentive awards of $2,500 for each class representative appear reasonable and appropriate.  Plaintiffs helped counsel investigate and prosecute the claims in this case by providing personal information and documents.  (*See* Fee Mot. at 31.)  The proposed awards reflect the amount of time Plaintiffs spent on this case, are within the range of incentive awards typically approved in this district, and are presumptively reasonable.  *See Bellinghausen*, 306 F.R.D. at 266.

## IV.     CONCLUSION

For the foregoing reasons, Plaintiffs' motions for final approval and for fees, expenses, and incentive awards are **GRANTED IN SUBSTANTIAL PART**.  The Court **GRANTS** final approval of the Settlement.  Class counsel is awarded $719,224.73 in attorney fees and $9,101.10 in costs.  Angeion shall receive administrative costs not to exceed $114,000.  The two class representatives shall receive service awards of $2,500 each.  Ms. Lau's objection is **OVERRULED**.

DATED:     October 30, 2023

CORMAC J. CARNEY
UNITED STATES DISTRICT JUDGE

CC: FISCAL